IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAWN PATRICK O'LEARY | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| WEXFORD HEALTH SOURCES, INC., ET AL. | : | NO. 16-1393 |

<u>MEMORANDUM</u>

**Padova, J.**                                                                                                   January 17, 2017

Plaintiff Shawn Patrick O'Leary has brought this action against Wexford Health Sources, Inc. ("Wexford") and two doctors employed by Wexford, asserting claims regarding the medical care that Defendants provided to him while he was incarcerated at the State Correctional Institute at Chester, Pennsylvania ("SCI Chester"). Defendants have moved to dismiss O'Leary's First Amended Complaint. For the reasons that follow, the Motion is granted in part and denied in part.

**I.    FACTUAL BACKGROUND**

The First Amended Complaint alleges the following facts. From February 14, 2013 until November 18, 2014, O'Leary was committed to the custody of the Pennsylvania Department of Corrections ("DOC") for a probation violation. (1st Am. Compl. ¶ 11.) O'Leary was housed at SCI Chester from May 22, 2013 until June 13, 2014, when he was transferred to the State Correctional Institution at Pittsburgh, Pennsylvania ("SCI Pittsburgh"). (<u>Id.</u>) During this time, Wexford was the health care provider for all DOC facilities, including SCI Chester. (<u>Id.</u> ¶ 4.) Wexford employed Defendant Raul Yankelvich, M.D. as a doctor at SCI Chester. (<u>Id.</u> ¶¶ 5-6.) Defendant Stephen Ritz, D.O. was at all relevant times the Corporate Medical Director and

Corporate Utilization Management Director for Wexford, with medical overview authority for all of the DOC facilities, including SCI Chester. (Id. ¶ 7.)

In 2009, O'Leary was involved in a motor vehicle accident and suffered an injury to his right hip joint. (Id. ¶ 36.) In September 2010, he underwent a right total hip replacement due to posttraumatic arthritis of his right hip. (Id.) On March 27, 2014, while he was incarcerated at SCI Chester, O'Leary began to experience pain, swelling, and the draining of pus in the areas of the surgical scar. (Id. at ¶ 12.) He went to SCI Chester's medical unit complaining of right hip pain, redness and swelling. (Id.) He was placed on the referral sheet for the next available doctor. (Id.)

Two days later, on March 29, 2014, O'Leary was seen by Dr. A.M. Eubanks, who noted that O'Leary's right hip was swollen and tender and had some drainage. (Id. ¶ 13.) On March 31, 2014, O'Leary was treated by Dr. Yankelvich, who stated in O'Leary's progress notes that he was being treated with antibiotics. (Id. ¶ 14.) Dr. Yankelvich also requested a complete blood count, which was done that day; scheduled x-rays of O'Leary's right hip for April 2, 2014; and ordered that the dressing on O'Leary's wound be changed daily for seven days. (Id. ¶¶ 14-15.) On April 7, 2014, Dr. Yankelvich received the April 2, 2014 x-ray report, which showed a possible loosening of the femoral stem (the part of O'Leary's hip replacement that was inserted into his femur). (Id. ¶ 17.) On May 1, 2014, O'Leary reported to sick call and stated that the Elavil and naproxen that he had been prescribed were insufficient to treat his pain. (Id. ¶ 18.) On May 19, 2014, O'Leary again went to sick call and reported right hip swelling and pain and was told to wait for a consultation with an orthopedic specialist. (Id. ¶ 19.) The nurse who examined O'Leary on that occasion noted that the skin on his right hip was warm to the touch, he was having trouble walking, and he was using a cane. (Id. ¶ 20.) O'Leary was prescribed

2

antibiotics. (Id.) O'Leary reported to sick call again on May 20, 2014. (Id.) The doctor recommended that O'Leary's right hip be x-rayed on May 21, 2014, and noted that he was working to obtain a consultation with an orthopedic specialist. (Id.) On May 22, 2014, the prison received the results of O'Leary's x-rays, which showed "loosening around the femoral stem," suggesting loosening of arthroplasty. (Id. at ¶ 21.) Dr. Yankelvich wrote in O'Leary's progress notes that he needed an emergency consultation with an orthopedic specialist. (Id. ¶ 22.) On May 23, 2014, Dr. Ritz approved Dr. Yankelvich's recommendation that O'Leary be taken to see an orthopedic specialist. (Id. ¶ 23.)

On May 29, 2014, O'Leary was taken to the office of orthopedic specialist Evan K. Bash, M.D. for a consultation regarding his right hip. (Id. ¶ 25.) Dr. Bash wrote in his report that O'Leary had intermittent moderate to severe right hip pain that was worsening and was aggravated by movement, sitting, walking and standing. (Id. ¶ 25.) Dr. Bash concluded that O'Leary would "[r]equire[] implant removal and prostalac with 6 weeks IV antibiotics and revision prosthesis." (Id.) On May 30, 2014, following this consultation, Dr. Yankelvich signed a Physician's Order Form that stated in part "[c]onsult with Orthopedics for Revision of right hip Arthroplasty." (Id. ¶ 26.) On the same day, Dr. Yankelvich also signed a progress note for O'Leary which stated "Inmate examined - R. hip: redness, tenderness and minimal drainage from surgical scar - Inmate is being treated with Keflex as per consultant." (Id. ¶ 28 (internal quotation marks omitted).) O'Leary had additional right hip surgical scar drainage on May 31, 2014 and was sent back to Dr. Bash on June 2, 2014. (Id. at ¶¶ 29-30.) Dr. Bash wrote in his June 2, 2014 status note that "[i]t would be in Shawn's best interest to have his right hip revision done at Temple by his original surgeon." (Id. ¶ 30 (internal quotation marks omitted).)

On June 13, 2014, O'Leary was transferred to SCI Pittsburgh. (Id. ¶ 31.) He was told by medical personnel employed by Wexford that he had been transferred because Wexford had a contract with hospitals in Pittsburgh. (Id.) On June 17, 2014, O'Leary was seen at SCI Pittsburgh by Patricia Meister, RN, who recorded in O'Leary's progress notes that O'Leary believed that no one knew that he was being transferred to SCI Pittsburgh. (Id. ¶ 32.) O'Leary was seen by Patricia Meister, RN again on June 18, 2014, at which time he complained of hip pain and indicated that he wanted to stop taking his antibiotics. (Id. ¶¶ 33-34.) Nurse Meister talked to him about the need to take his antibiotics so that he could have surgery and he agreed to speak with a doctor before refusing his antibiotics. (Id. ¶ 34.) On June 19, 2014, O'Leary was seen by Dr. Rochelle Rosen, who discussed O'Leary's concerns about taking his antibiotics and also informed O'Leary that he would need to meet with a surgeon before his surgery could be scheduled. (Id. ¶ 35.) Dr. Rosen wrote in O'Leary's progress notes that his hip was infected, he was taking antibiotics, and he was waiting for a consult. (Id.)

On July 11, 2014, O'Leary was taken to an appointment with orthopedic specialist Brian Moore, M.D. in Pittsburgh, Pennsylvania. (Id. ¶ 36.) Dr. Moore examined O'Leary and found that he used a cane to walk, he was not in acute distress, he had a "long posterolateral incision with about a 2cm sinus tract at the inferior pole, which does show green and yellow purulence actively draining from the wound. He has minimal erythema surrounding the incision." (Id.) Dr. Moore concluded that O'Leary had an infected right total hip arthroplasty and a potentially loose femoral component. (Id.) Dr. Moore told O'Leary that the best treatment "would be to do a two-stage hip explantation and then re-implantation down the road. We would also have to do several weeks of IV antibiotics through a PICC line after his first surgery." (Id.) On July 23, 2014, "O'Leary had a surgical procedure of his right hip replacement area . . . performed by

4

Julius J. Huebner, M.D. at Allegheny Hospital in Pittsburgh." (Id. ¶ 37.) On September 3, 2014, Dr. Huebner performed another surgical procedure of O'Leary's right hip replacement area. (Id.) On November 5, 2014, Dr. Huebner performed a total revision right hip replacement/arthroplasty surgery for O'Leary. (Id.)

The First Amended Complaint asserts three claims for relief. Count I asserts a claim pursuant to 42 U.S.C. § 1983 against all Defendants for deliberate indifference to O'Leary's serious medical needs in violation of the Eighth Amendment to the United States Constitution; Count II asserts a medical malpractice claim against Dr. Yankelvich pursuant to Pennsylvania common law. The caption of Count III states that it is a claim for medical malpractice brought pursuant to state law, but it does not specify the Defendant(s) against whom this claim has been brought or the basis for the claim. Defendants move to dismiss the First Amended Complaint on five grounds: (1) Plaintiff failed to exhaust his administrative remedies prior to filing suit; (2) the First Amended Complaint was not filed within the time period permitted by Federal Rule of Civil Procedure 15; (3) Count I fails to allege facts that would establish that Defendants were deliberately indifferent to Plaintiff's serious medical needs; (4) Plaintiff failed to file certificates of merit with respect to his medical malpractice claims against Wexford and Dr. Ritz; and (5) the First Amended Complaint fails to allege facts that would establish that Defendants' conduct satisfies the requirements for an award of punitive damages under Pennsylvania law.

## II. LEGAL STANDARD

When considering a motion to dismiss pursuant to Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as

undisputedly authentic documents if the complainant's claims are based upon these documents."[1] Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)). We take the factual allegations of the complaint as true and "construe the complaint in the light most favorable to the plaintiff." DelRio-Mocci v. Connolly Props., Inc., 672 F.3d 241, 245 (3d Cir. 2012) (citing Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011)). Legal conclusions, however, receive no deference, as the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" Wood v. Moss, 134 S. Ct. 2056, 2065 n.5 (2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," which gives "'the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2), and Conley v. Gibson, 355 U.S. 41, 47 (1957)). The complaint must contain "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'" Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678

---

[1] Defendants ask us to dismiss the First Amended Complaint in its entirety. However, their Motion does not specify the Federal Rule of Civil Procedure pursuant to which they have moved and does not contain any mention of the legal standard they believe should be utilized in this case. We assume, however, that they are moving to dismiss the First Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) and we therefore decide the Motion on that basis.

(citing Twombly, 550 U.S. at 556). "A complaint that pleads facts 'merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief.'" Connelly v. Lane Constr. Corp., 809 F.3d 780, 786 (3d Cir. 2016) (alteration in original) (quoting Iqbal, 556 U.S. at 678). In the end, we will grant a motion to dismiss brought pursuant to Rule 12(b)(6) if the factual allegations in the complaint are not sufficient "'to raise a right to relief above the speculative level.'" W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank, 712 F.3d 165, 169 (3d Cir. 2013) (quoting Twombly, 550 U.S. at 555).

### III. DISCUSSION

#### A. Exhaustion of Administrative Remedies

Defendants argue that the First Amended Complaint should be dismissed because O'Leary did not exhaust his administrative remedies with the DOC before he filed suit. Defendants rely on the Prison Litigation Reform Act ("PLRA"), which provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Defendants contend that O'Leary was required to comply with this provision, even though he was not incarcerated at the time he commenced the instant litigation. The United States Court of Appeals for the Third Circuit has not, however, adopted Defendants' position. Rather, the Third Circuit has explained that the PLRA only requires a plaintiff to exhaust administrative remedies "if the plaintiff is a prisoner at the time of filing." Abdul-Akbar v. McKelvie, 239 F.3d 307, 314 (3d Cir. 2001) (citation omitted); see also Ahmed v. Dragovich, 297 F.3d 201, 210 (3d Cir. 2002) (stating that "a prisoner who has been released is not precluded by the PLRA from filing a § 1983 suit for incidents concerning prison conditions which occurred prior to his release");

George v. Chronister, 319 F. App'x 134, 137 (3d Cir. 2009) (stating that "under the PLRA, the plaintiff's status as a 'prisoner' is determined at the time his complaint is 'brought' or filed in court, not when the alleged incident(s) occurred" (citing Ahmed, 297 F.3d 201 at 210, and Abdul-Akbar, 239 F.3d at 314)). The First Amended Complaint alleges that O'Leary was released from DOC custody on November 18, 2014. (1st Am. Compl. ¶ 11.) He initiated this suit more than four months later, on March 26, 2016, at which time he was "free of the strictures of the PLRA." Ahmed, 297 F.3d at 210. Accordinlgy, the exhaustion requirement of the PLRA did not apply to O'Leary at the time he filed the instant suit, and the Motion to Dismiss is denied as to this argument.

      B.     Compliance with Rule 15

Defendants argue that we should dismiss the First Amended Complaint because Plaintiff failed to file it within the time period set forth in Federal Rule of Civil Procedure 15. Rule 15 provides that "[a] party may amend its pleading once as a matter of course within . . . 21 days after service of a motion under Rule 12(b), (e), or (f) . . . ." Fed. R. Civ. P. 15(a)(1). Defendants filed a Motion to Dismiss the original Complaint on June 23, 2016. O'Leary filed the First Amended Complaint on July 14, 2016, 21 days after Defendants filed their Motion to Dismiss. Since O'Leary filed the First Amended Complaint within the time period provided by Rule 15(a)(1), we deny the Motion to Dismiss as to this argument.

      C.     The Eighth Amendment

Defendants argue that we should dismiss Count I of the First Amended Complaint because it does not allege a facially plausible § 1983 claim for violation of the Eighth Amendment. Count I alleges that the Defendants "failed with deliberate indifference, to provide necessary and proper medical care to Plaintiff Shawn Patrick O'Leary, thereby causing the

8

violation of his rights under the 8th Amendment to the U.S. Constitution . . . ." (1st Am. Compl. ¶ 42.) The Eighth Amendment's right to be free from cruel and unusual punishment "imposes duties on [prison] officials, who must . . . ensure that inmates receive . . . medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526–27 (1984), additional citations omitted). To state a claim under the Eighth Amendment arising from an inmate's medical care, a complaint must plausibly allege that a defendant showed "[1] deliberate indifference to [2] serious medical needs of [a] prisoner[ ]." Estelle v. Gamble, 429 U.S. 97, 104 (1976). Courts have consistently held that "mere allegations of malpractice" are not sufficient to allege "deliberate indifference." Id. at 106 n.14.

"Deliberate indifference can be shown by a prison official 'intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.'" Stones v. McDonald, 573 F. App'x 236, 237 (3d Cir. 2014) (per curiam) (quoting Estelle, 429 U.S. at 104-05). "However, '[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" Positano v. Pa. Cardiothoracic Surgery, Inc., 610 F. App'x 191, 193 (3d Cir. 2015) (per curiam) (alteration in original) (quoting United States ex rel. Walker v. Fayette Cty., 599 F.2d 573, 575 n.2 (3d Cir. 1979)).

"A medical need is serious if it is one that 'has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" Stones, 573 F. App'x at 237 (quoting Monmouth Cty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987)). Moreover, the medical need "'must

be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death.'" Tsakonas v. Cicchi, 308 F. App'x 628, 632 (3d Cir. 2009) (quoting Colburn v. Upper Darby Twp., 946 F.2d 1017, 2023 (3d Cir. 1991)).

A prison official acts with deliberate indifference to a serious medical need "when he knows of and disregards an excessive risk to inmate health or safety." Brown v. Thomas, 172 F. App'x 446, 450 (3d Cir. 2006) (citing Farmer, 511 U.S. at 837). "The official must be aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. (citation omitted). "[D]eliberate indifference 'requires obduracy and wantonness, which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk.'" Baez v. Falor, 566 F. App'x 155, 158 (3d Cir. 2014) (quoting Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)). Accordingly, negligence or medical malpractice is not sufficient to establish deliberate indifference. Rouse, 182 F.3d at 197; see also Farmer, 511 U.S. at 835 (stating that "Eighth Amendment liability requires 'more than ordinary lack of due care for the prisoner's interests or safety'" (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). "'Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . (which) remains a question of sound professional judgment.'" Bonadonna v. Zickefoose, 601 F. App'x 77, 79 (3d Cir. 2015) (per curiam) (alteration in original) (quoting Inmates of Allegheny Cty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)). Thus, "[t]he deliberate indifference 'test affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients.'" Beckett v. Pennsylvania Dep't of Corrs., 597 F. App'x 665, 668 (3d Cir. 2015) (citing Inmates of Allegheny Cty. Jail, 612 F.2d at 762).

Defendants do not dispute that the First Amended Complaint sufficiently alleges that O'Leary had significant medical needs while he was incarcerated at SCI Chester. However, they argue that the First Amended Complaint does not allege facts that would establish that they were deliberately indifferent to those serious medical needs. Rather, Defendants contend that the First Amended Complaint instead alleges facts that suggest that O'Leary received ample treatment for his medical condition, including treatment by outside physicians.

1.     Delay in referral to a specialist

O'Leary argues that the First Amended Complaint alleges a facially plausible § 1983 claim for violation of his Eighth Amendment rights because it alleges that Defendants did not send him to an orthopedic specialist until May 29, 2014, nearly two months after Dr. Yankelevich first noted (on April 4, 2014) that he needed an orthopedic consult. (1st Am. Compl. ¶¶ 16, 25.) However, allegations that an inmate's medical care was delayed will only be sufficient to state § 1983 claim for violation of the Eighth Amendment if the complaint also alleges that the delay resulted in the worsening of the inmate's serious medical condition. See Brooks v. Kyler, 204 F.3d 102, 105 n.4 (3d Cir. 2000) (concluding that plaintiff's claim that defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment based on a delay in medical treatment could not survive summary judgment because the plaintiff "presented no evidence of any harm resulting from a delay in medical treatment" (citing Hudson v. McMillian, 503 U.S. 1, 9 (1992)). See also Gibbons v. Montgomery Cty., Civ. A. No. 16-1233, 2016 WL 3878182, at *7 (E.D. Pa. July 18, 2016) (concluding that complaint failed to allege a claim for deliberate indifference to serious medical needs in violation of the Eighth Amendment where complaint did not allege that delays in plaintiff's treatment resulted in substantial harm (citing Brooks, 204 F.3d at 105 n.4)); Nesmith v. S. Health Partners, Civ. A.

11

No. 11-425, 2012 WL 426606, at *4 (W.D. Pa. Jan. 2012) ("Where a prisoner alleges delay in receiving medical treatment, he must show that the delay led to further harm." (citing Brooks, 204 F.3d at 105 n.4)); Fielder v. Fornelli, Civ. A. No. 09-881, 2011 WL 4527322, at *9 (W.D. Pa. Sept. 6, 2011) (explaining that, as a general rule "'delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in . . . harm'" (quoting Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993); and citing Sealock v. Colorado, 218 F.3d 1205, 1210 (10th Cir. 2000); Brooks, 204 F.3d at 105 n.4)), report and recommendation adopted, 2011 WL 4527374 (W.D. Pa. Sept. 28, 2011)

The First Amended Complaint does not allege that O'Leary went untreated or that his condition worsened because Defendants did not send him to an orthopedic specialist until May 29, 2014. To the contrary, the First Amended Complaint alleges that, between April 4 and May 29, 2014, O'Leary was treated by medical personnel at SCI Chester four times, that he was given pain killers and antibiotics, and that additional x-rays were taken of his right hip. (1st Am. Compl. ¶¶ 17-24.) We conclude, accordingly, that the First Amended Complaint does not allege a facially plausible claim for deliberate indifference to O'Leary's serious medical needs in violation of the Eighth Amendment based on the passage of time between Dr. Yankelevich's first notation that O'Leary should have a consultation with an orthopedic specialist and O'Leary's appointment with Dr. Bash.

        2.        Failure to send O'Leary back to his prior surgeon

O'Leary further argues that that the First Amended Complaint alleges a facially plausible claim for violation of his Eighth Amendment rights because it alleges that Defendants transferred him to SCI Pittsburgh for his surgery despite Dr. Bash's recommendation that the surgery be performed at Temple University Hospital by O'Leary's original surgeon. (Id. ¶¶ 30-31.)

12

However, an allegation that prison officials decided to send a prisoner to a surgeon other than the surgeon preferred by the prisoner will not support a claim for deliberate indifference to a prisoner's serious medical needs in violation of the Eighth Amendment. See Jenkins v. Berrier, Civ. A. No. 15-277, 2016 WL 4940038, at *4 (W.D. Pa. July 27, 2016) (stating that "it is well established that an inmate does not have a constitutional right to see . . . the doctor of his choice) (citations omitted)). See also Sanchez v. Coleman, Civ. A. No. 13-982, 2014 WL 7392400, at *7 (W.D. Pa. Dec. 11, 2014) (same (citing Jetter v. Beard, 130 F. App'x 523, 526 (3d Cir. 2005)); Maqbool v. Univ. Hosp. of Med. & Dentistry of N.J., Civ. A. No. 11-4592, 2012 WL 2374689, at *9 (D.N.J. June 13, 2012) (stating that "refusal . . . to summon the medical specialist of the inmate's choice . . . cannot amount to cruel and unusual punishment" (citations omitted)). We conclude, accordingly, that the First Amended Complaint does not allege a facially plausible claim for deliberate indifference to O'Leary's serious medical needs in violation of the Eighth Amendment based on allegations that Defendants transferred O'Leary to SCI Pittsburgh for surgery rather than have the surgery performed by the surgeon who performed O'Leary's original hip replacement at Temple University Hospital.

        3.        Transfer to SCI Pittsburgh

O'Leary further argues that the First Amended Complaint alleges a facially plausible claim for violation of his Eighth Amendment rights because it alleges that Defendants transferred him to SCI Pittsburgh on June 13, 2014, "without medical consult or authorization, thereby, [preventing] the medical personnel at SCI Pittsburgh from properly, promptly, and adequately treating his serious medical condition and scheduling him for necessary surgeries." (Pl.'s Mem., Part Two at 10.) However, the First Amended Complaint does not allege that Defendants transferred O'Leary to S.C.I. Pittsburgh without obtaining medical authorization and without

13

notifying personnel at SCI Pittsburgh that O'Leary would need to consult with an orthopedic surgeon after his arrival.  The First Amended Complaint also does not allege that medical personnel at SCI Pittsburgh were unable to provide appropriate treatment for O'Leary's serious medical needs and schedule his surgeries.

The First Amended Complaint actually alleges that O'Leary *believed* that medical personnel at SCI Pittsburgh were not aware that he had been transferred there for surgery.  (1st Am. Compl. ¶¶ 32-34.)  However, the First Amended Complaint also alleges O'Leary was seen by medical personnel three times in the week following his transfer to SCI Pittsburgh; was treated with antibiotics; was counseled about the need to continue taking his antibiotics so that he could have surgery; and was told that he would need to have a consultation with a surgeon in Pittsburgh so that his surgery could be scheduled.  (Id. ¶¶ 32-35.)  The First Amended Complaint also reports that the doctor who treated O'Leary at SCI Pittsburgh on June 19, 2014, six days after his transfer, wrote in O'Leary's progress notes that O'Leary (1) had been diagnosed with an infected replacement hip, (2) was being treated with antibiotics, and (3) was awaiting a medical consultation.  (Id. ¶ 35.)  The First Amended Complaint further alleges that O'Leary was sent to Dr. Brian Moore for an orthopedic consultation on July 11, 2014.  (Id. ¶ 36.)  We conclude that the factual allegations contained in the First Amended Complaint do not support Plaintiff's assertion that Defendants transferred him to SCI Pittsburgh "without medical consult or authorization, thereby, [preventing] the medical personnel at S.C.I. Pittsburgh from properly, promptly, and adequately treating his serious medical condition and scheduling him for necessary surgeries."  (Pl.'s Mem., Part Two at 10.)  We further conclude that the First Amended Complaint does not allege a facially plausible claim for deliberate indifference to O'Leary's

serious medical needs in violation of the Eighth Amendment based on his transfer to SCI Pittsburgh.

For the reasons stated above, we conclude that Count I of the First Amended Complaint fails to state a facially plausible § 1983 claim for deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment. The Motion to Dismiss is, therefore, granted as to Count I of the First Amended Complaint.

### D. Medical Malpractice

Defendants ask that we dismiss the state law malpractice claims asserted against Wexford and Dr. Ritz in Counts II and III of the First Amended Complaint because O'Leary failed to submit a certificate of merit as to these Defendants. However, the First Amended Complaint does not assert medical malpractice claims against Wexford and Dr. Ritz. Accordingly, we deny the Motion to Dismiss as to Plaintiff's claims for medical malpractice on this basis.

### E. Punitive Damages

Defendants ask that we dismiss Plaintiff's request for an award of punitive damages because the First Amended Complaint does not allege facts that would establish grounds for an award of punitive damages under Pennsylvania law. Defendants rely on Pennsylvania's Medical Care Availability and Reduction of Error Act (the "MCARE Act"), which provides that "[p]unitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others."[2] 40 Pa. Stat. Ann. §

---

[2] Defendants have supplied no authority that would establish that the MCARE Act applies to O'Leary's request for punitive damages in connection with his § 1983 claim in Count I of the First Amended Complaint. Accordingly, we consider Defendants' MCARE Act argument only with respect to O'Leary's request for punitive damages in connection with his state law malpractice claims in Counts II and III.

1303.505(a).  "A showing of gross negligence is insufficient to support an award of punitive damages."  Id. § 1303.505(b).

O'Leary argues that the First Amended Complaint sufficiently alleges that Defendants conduct with respect to his medical treatment constituted willful or wanton conduct or reckless indifference to his rights because "no consult or authorization existed for medical treatment for Mr. O'Leary's said serious medical condition when he was transferred to [SCI Pittsburgh]" and because Defendants failed to "provide necessary and proper medical care for his serious medical condition."  (Pl.'s Mem., Part Two at 11.)  However, as we have discussed above, the facts alleged in the First Amended Complaint do not support O'Leary's assertion that he was transferred to SCI Pittsburgh with no consult or authorization for medical treatment.  Indeed, the First Amended Complaint alleges that O'Leary received medical treatment in the days immediately following his transfer to SCI Pittsburgh and that he was subsequently sent to an appointment with an orthopedic specialist in Pittsburgh.  (See 1st Am. Compl. ¶¶ 32-36.)  Moreover, the First Amended Complaint is replete with allegations detailing the medical care that Wexford and its employees provided to Plaintiff for his serious medical condition, including treatment with antibiotics and pain medication, x-rays, consultations with orthopedic specialists, and three surgeries.  (Id. ¶¶ 12-37.) We conclude that the First Amended Complaint fails to state a facially plausible claim for punitive damages against Defendants pursuant to the MCARE Act.  The Motion to Dismiss is, therefore, granted with respect to Plaintiff's request for an award of punitive damages in connection with his claims for medical malpractice and that request for relief is dismissed.

## IV.     CONCLUSION

For the reasons stated above, the Motion to Dismiss is granted in part and denied in part. The Motion is granted as to Plaintiff's § 1983 claim in Count I that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment and his request for an award of punitive damages in connection with his claim for medical malpractice under Pennsylvania law.  The Motion is denied as to Defendants' arguments that we dismiss the First Amended Complaint in its entirety because O'Leary failed to exhaust his administrative remedies prior to filing suit and failed to file the First Amended Complaint within the time provided by Federal Rule of Civil Procedure 15.  The Motion is also denied as to Defendants' request that we dismiss the medical malpractice claims asserted against Wexford and Dr. Ritz because the First Amended Complaint asserts no such claims.

O'Leary has asked that we grant him leave to file a second amended complaint if we find that the First Amended Complaint fails to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).  "[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." Phillips v. Cty. of Allegheny, 515 F.3d 224, 245 (3d Cir. 2008) (citing Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004)).  We are not convinced that amendment of Plaintiff's § 1983 claim in Count I or his request for punitive damages would be either inequitable or futile.  Thus, we grant O'Leary's request to file a second amended complaint.

An appropriate order follows.

BY THE COURT:

/s/ John R. Padova
_____
John R. Padova, J.

17